UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,

       Plaintiff,

v.

                                      Case No. 1:15-CR-120

                                      HON. GORDON J. QUIST

QUINTIN HOWELL, a/k/a 'Ghost,"
a/k/a "Q," MAURICE STREETER,
a/k/a "Dreds,"and JUSTIN JENKINS,
a/k/a "Peanut," a/k/ "Mike,"

       Defendants.

_____/

## OPINION REGARDING DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE OBTAINED FROM SEARCHES

Defendants, Quintin Howell, Maurice Streeter, and Justin Jenkins, have been charged in a first superseding indictment containing nine counts alleging violations of drug and firearm laws.[1] Howell, Streeter, and Jenkins filed motions to suppress evidence obtained from various locations in December 2014 and April 2015. In particular, Howell moves to suppress evidence obtained from searches of 3130 Dori Drive (Dori Drive), Apartment 103, Oshtemo Township, Michigan on December 18, 2014, and 755 Dragonfly (Dragonfly), Apartment 265, Oshtemo Township, Michigan, on April 8, 2015. Streeter moves to suppress evidence obtained from a search of 4309 Lakesedge,

---

[1]Count 1 charges all Defendants with conspiracy to distribute heroin and cocaine base from in or about 2013 through and including August 21, 2015. Counts 2 through 4 charge Howell and Streeter with possession with intent to distribute heroin, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C); felon in possession of a firearm, in violation of 18 U.S.C. § 2 and 18 U.S.C. §§ 921(a), 922(g)(1), and 924(a)(2); and possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(I). Count 5 charges Howell and Jenkins with possession with intent to distribute heroin in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Finally, Counts 6 through 9 charge Jenkins with possession with intent to distribute cocaine base and cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); possession with intent to distribute heroin, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(I), and 841(b)(1)(C); felon in possession of a firearm, in violation of 18 U.S.C. § 2 and 18 U.S.C. §§ 921(a), 922(g)(1), and 924(a)(2); and possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(I). The superseding indictment also contains various criminal forfeiture allegations.

Apartment C, Kalamazoo, Michigan (Lakesedge) on December 18, 2014. Finally, Jenkins moves to suppress evidence obtained from the search of Dragonfly and searches of 300 Candlewyck Drive, Apartment 1203, Kalamazoo, Michigan (Candlewyck) and 520 Edwin (Edwin), Kalamazoo, Michigan, on April 8, 2015.

The Court heard oral argument on the motions on August 10, 2016. For the reasons explained below, the Court will deny the motions as to all of the searches because the search warrants were supported by probable cause and/or the *Leon* good faith exception applies. In addition, the Court will deny Howell's and Streeter's motions for a *Franks* hearing.

## I. BACKGROUND

### A. Fall 2014 Heroin Investigation[2]

In the fall of 2014, investigators from the Kalamazoo Valley Enforcement Team (KVET), the Drug Enforcement Administration, and the Federal Bureau of Investigation conducted an investigation of drug trafficking occurring in Kalamazoo and Benton Harbor, Michigan. In late October, investigators began working with a confidential informant (CI) who said that he had purchased heroin from a group of individuals and had arranged the purchases by calling cell phone number (269) 348-1824 (Ghost Phone). The CI said that an individual known as "Ghost" was the leader and another individual known as "Dreds" was also involved. The CI also said that "Dreds" and "Ghost" often traveled together in the same vehicle to the drug transactions.

At some point, investigators showed the CI a prior arrest photograph of Howell, who was also known as "Ghost," and the CI identified Howell as "Ghost." In connection with a prior arrest, Howell had listed his address as 3130 Dori Drive, Apartment 103, Oshtemo Township, Michigan. Investigators also showed the CI a prior arrest photograph of Streeter; the CI identified Streeter as the person he knew as "Dreds."

---

[2]The facts pertaining to the fall 2014 investigation are taken from the affidavit of Officer Chris Reiser in support of the warrant for Dori Drive.

## 1.    Five Controlled Buys

Between October 23, 2014 through approximately December 15, 2014, the CI set up five separate controlled purchases of heroin.    The routine for each purchase was similar.    After investigators searched the CI and the CI's vehicle for contraband, they provided the CI with registered "buy money."    The CI then placed a recorded call to the Ghost Phone and was instructed, usually by Howell, where to go to buy the heroin.    Investigators observed the CI during the entire transaction and made video and audio recordings of at least some of the purchases.    Following the transaction, investigators met with the CI and obtained the suspected drugs.    The investigators searched the CI again for the presence of contraband.    The substance was obtained from the CI and field tested, and in each instance the substance tested positive for heroin.

The details of each controlled purchase are as follows[3]:

- October 23, 2014.    After placing a recorded call to the Ghost Phone, the CI was advised to meet at a location in Kalamazoo.    The CI made contact with two black males in a black BMW who were identified as "Dreds and Ghost" (Streeter and Howell).    The CI said that "Dreds" was the driver and delivered the heroin and that Ghost was the passenger.

- October 30, 2014.    After placing a recorded call to the Ghost Phone, the CI was advised to meet at a location in Kalamazoo.    KVET officers observed the CI make contact with a maroon Jeep Cherokee.    The driver, identified as "Dreds," told the CI to get into the Jeep, where "Ghost" was sitting in the passenger seat with a plastic bag filled with separately packaged bindles of heroin.    The CI paid the money to "Ghost," who gave the CI the heroin and told him to get out of the car.    On debriefing, the CI confirmed that ""Ghost," a/k/a Howell, was the individual who sold the heroin to the CI.

- November 17, 2014.    The CI placed a recorded call to the Ghost Phone and was told to go to a location in Kalamazoo to purchase heroin.    KVET officers observed the CI make contact with a black Chrysler 300, Michigan license plate DFD 9251.    Ths Chrysler was registered to Lashonda Reynolds of 3130 Dori Drive, Apartment 103, who was Howell's girlfriend.    KVET officers identified "Dreds," a/k/a Streeter, as the driver.    The CI told investigators that "Ghost" was the passenger and was the individual who sold the CI the heroin.

---

[3]Audio/Visual recordings were made for at least the October 23, October 30, and November 17 controlled purchases.

- Early December 2014.  The CI placed a recorded call to the Ghost phone, and was told by Howell to call another cell phone number.  The CI called that number and was instructed to drive to the west side of Kalamazoo to purchase heroin.  The CI drove to the Best Western Hotel parking lot, and within several minutes an unknown vehicle pulled into the parking lot driven by an unknown black male, later identified as Kyle Lewis (a co-Defendant who has pled guilty and been sentenced by this Court).  The CI made contact with the unknown male, who sold the CI heroin from the drivers seat.  After the deal was complete, investigators observed Howell drive past the sale location in the black Chrysler 300 registered to Lashonda Reynolds.

- Mid December 2014.  In the final buy, the CI placed a recorded call to the Ghost phone.  The individual the CI spoke to in the previous transaction told the CI to go to the Best Western parking lot.  After arriving at the Best Western parking lot, the CI placed another call and was told to go to the Holiday Inn parking lot.  A black 2014 Toyota with Colorado License Plate 912XBO arrived in the parking lot, where KVET investigators observed the informant purchase heroin from the driver's window of the Toyota.

Following the first controlled purchase in October, KVET investigators obtained a GPS phone ping search warrant on the Ghost Phone number for the purpose of obtaining call location data.  The surveillance conducted pursuant to that warrant showed that the Ghost Phone was frequently in the area of both Dori Drive and Lakesedge during the day and overnight.

2.    Other Surveillance

In addition to observing the controlled purchases, KVET officers conducted surveillance of Dori Drive and Lakesedge.  On December 11, 2014, KVET investigators saw Howell looking out of the second story window of Dori Drive.  Howell later exited the building after a red Nissan pulled into the parking lot.  The driver, a black male, recognized as the seller of the heroin in the fourth purchase, exited his vehicle and met with Howell.  This driver returned to the red Nissan and followed Howell as Howell walked to an adjacent parking lot.  The two men then entered a blue Buick with a Minnesota license plate, 628 NJR, and drove away.

In early December 2014, a KVET investigator observed the maroon Jeep Cherokee, license plate ABN672, that was involved in the October 30, 2014 controlled purchase, parked in front of Lakesedge.  The vehicle was registered to Demaurious Lamar Streeter of 392 Thurgood Ave.,

Benton Harbor, Michigan.  Around the same time in December, a KVET investigator observed the Ghost Phone ping in the area of Lakesedge.  While pulling into the apartment complex, the investigator observed the blue Buick previously driven by Howell heading toward the back of the complex with three black males inside.  The unknown black male (Lewis) seen previously in the Red Nissan was driving; Howell was the front seat passenger; and Streeter was in the back seat.  The investigator observed the blue Buick travel to the Cedar Trails Apartment Complex, where it engaged in a suspected drug deal.  The blue Buick then returned to Lakesedge, where Streeter and a small child exited the vehicle and entered the apartment.

### 3.     December 18, 2014 Search Warrants

On December 18, 2014, investigators executed search warrants at Dori Drive and Lakesedge, as well as three other locations.  KVET Officer Chris Reiser prepared and submitted the supporting affidavits, which detailed, among other things: (1) the controlled purchases; (2) cellular location data for the Ghost Phone; and (3) surveillance conducted during the investigation.[4]  As a result of the search of Dori Drive, officers discovered 0.65 grams of heroin, a scale with heroin residue, a police scanner, firearms, ammunition, $1,933 in cash, numerous cell phones, and hotel keys.  During the search of Lakesedge, officers discovered 13.88 grams of heroin, firearms, and ammunition.

### B.     The 2015 Investigation[5]

In December 2014, a confidential informant[6] (CI) told KVET investigators about a second cell phone, (469) 404-9440 (Ghost Phone 2), through which the CI could purchase heroin from "Ghost"/Howell.  The CI also said that, after making several purchases from Ghost, a person known

---

[4] Defendants have not challenged the warrant for a stash house, located at 6038 Eagle Court, Portage, Michigan, where investigators found 34.35 grams of heroin, or Room 416 of the Candlewood Suites—a hotel room where investigators discovered a woman flushing powder down the toilet at Lewis's instruction after he fled.

[5] The facts pertaining to the 2015 investigation are taken from the affidavits of Officer Reiser in support of the warrant applications for Dragonfly, Candlewyck, and Edwin.

[6] It appears that the CI for the 2015 investigation was the same CI for the Fall 2014 investigation.

as "Giovanni" started answering the Ghost Phone and delivering heroin. Investigators later identified Giovanni as Henry Hall, a co-Defendant who has since pled guilty and was sentenced by this Court. The informant also said that he could purchase heroin indirectly from an individual known as "Mike," who investigators later identified as Jenkins. Later, the CI told investigators that he received a text on February 23, 2015 providing a new phone number for heroin purchases, (702) 271-6908, and that the Ghost Phone 2 number had been phased out. The CI said that the new phone number was shared by "Mike"/"Giovanni" (Jenkins and Hall). During the 2015 investigation, KVET investigators conducted six controlled purchases, using the same procedures used for the 2014 controlled purchases, through the CI and conducted surveillance at three locations—Dragonfly, Candlewyck, and Edwin.

### 1. Dragonfly

KVET investigators determined that Howell was living at 755 Dragonfly, Apartment 265, and that Lashonda Reynolds, Howell's girlfriend and the registered owner of the black Chrysler 300 used in at least one of the 2014 controlled purchases, was the listed tenant for 755 Dragonfly, Apartment 265. On April 1 through the morning of April 2, 2015, investigators observed a gold Chevrolet Malibu parked outside of Dragonfly. Reynolds had leased the gold Malibu, bearing Ohio license plate GIF4906, from Hertz. On the morning of April 2, 2015, investigators observed Howell exit Dragonfly, drive the gold Malibu to Benton Harbor, and return to Dragonfly.

On April 6, 2015, the CI told a KVET investigator that Howell had called him within the last few days to say that Hall would be out of town for a while and the CI should contact Howell to purchase heroin. That same day, the CI arranged a controlled purchase from Howell by placing a recorded call to Howell. Prior to the purchase, an investigator observed Howell leave Dragonfly and enter the gold Malibu. Howell subsequently arrived at the Dover Hills apartment complex and sold heroin to the CI. After the sale, investigators observed Howell return to Dragonfly, exit the Malibu, and enter the apartment.

###     2.     Candlewyck/Edwin

On February 19, 2015, the CI made a controlled buy of heroin.  Prior to the purchase, the CI placed a call to the Ghost Phone 2 cell number.  Pursuant to instructions, the informant went to an apartment complex and made contact with a black male in a gold Chevrolet Malibu.  Following the purchase, the gold Malibu was observed going to a nearby gas station, where the driver was seen switching to a black Chevrolet Malibu bearing Michigan license plate 7LFN85.  The black Malibu was registered to Karmease Langston of 520 Edwin.

On February 25, 2015, the CI made two controlled purchases of heroin from Hall.  For the first purchase, the CI called the (702) number and was instructed to go to an apartment complex parking lot.  After the CI parked at the apartment complex, a baby blue Toyota Yaris bearing Missouri license plate PJ7U4S appeared, and investigators saw the CI make contact with the driver of the Yaris.  KVET investigators confirmed that Hall was the driver.  Following the sale, officers saw Hall park in the area of 300 Candlewyck and use a key to enter the building.  Hall left Candlewyck a short time later and stopped in parking lots of three businesses, where he made brief contacts with individuals in other vehicles in a manner indicative of drug sales.  Hall then drove to another apartment complex where he made contact with two additional vehicles.  Later that day, the CI called the same (702) phone number to set up a second purchase and was instructed to go to an apartment complex.  At the apartment complex, the CI purchased heroin from the driver of the baby blue Toyota Yaris.  After the sale, the driver of the Yaris picked up a passenger at the Value Place Hotel and returned to Candlewyck.

KVET investigators reviewed the tenant list for 300 Candlewyck and learned that Yaquina Walker was the listed tenant for apartment 1203.  Walker's address with the Secretary of State was listed in Benton Harbor.  During surveillance, KVET investigators observed Walker's 2008 Chevrolet Uplander parked in the area designated for 300 Candlewyck.  During the 2014

investigation, Walker's Chevrolet Uplander had been observed parked next to one of Howell's vehicles at the Value Place Hotel just prior to one of the controlled buys. The Uplander left the hotel parking lot within a couple of minutes after Howell's vehicle left.

On March 3, 2015, KVET investigators observed three black males arrive at Candlewyck in the baby blue Toyota Yaris and enter the building. About an hour and a half later, the driver and one of the passengers, who was carrying a black duffel bag, exited the building and got into the Yaris. The Yaris drove to 520 Edwin, where the passenger got out of the vehicle with the duffle bag and entered 520 Edwin. At that time, a black Yukon Denali, registered to Alexandria Lashon-Monique Parker of Benton Harbor, was parked in the driveway. After dropping off the passenger, the Yaris returned to Candlewyck. The following day, March 4, 2015, a KVET investigator observed the driver of the Yaris key into 300 Candlewyck, Apartment 1203.

On March 5, 2015, a KVET investigator observed a tan Chevy Trailblazer parked in front of Candlewyck. On March 31, 2015, Hall was observed exiting Candlewyck and driving the tan Trailblazer to two different apartment complexes, where he made brief contacts with drivers of other vehicles. While the Trailblazer was parked at the second apartment complex, KVET investigators arranged a controlled buy of heroin in that parking lot by having the CI make a recorded call to the (702) number. Investigators observed the CI make contact with the Trailblazer and purchase heroin from the driver, later confirmed to be Hall.

On April 1, 2015, KVET investigators observed Hall driving the Trailblazer from Candlewyck to Edwin, where the black Yukon Denali was parked and occupied by a black male. After Hall parked in front of Edwin, the black Yukon drove away. After the Yukon left, Howell arrived in the gold Malibu and parked next to the curb in front of Edwin. At some point, the black Yukon returned and parked in the driveway. Hall and Howell exited their vehicles and the driver of the Yukon left his vehicle. All three individuals hung around the driveway, talking and getting

into and out of the Yukon and Malibu.  Eventually, all three vehicles left Edwin.  Hall drove to the parking lot of Dunham's, a sporting goods store, where he met up with the black Yukon.  The driver of the Yukon went into the store with a child, exited the store with two large plastic bags, and returned to the Yukon.  Hall got out of the Trailblazer and walked up to the Yukon, where the driver of the Yukon handed Hall a small black plastic bag.  Both vehicles then left the parking lot.  Hall picked up a female, who was carrying an infant car seat, and returned to Candlewyck.  A short time later, the black Yukon arrived at Candlewyck.

On April 2, 2015, KVET investigators observed Hall and the female with an infant car seat leave Candlewyck and drive away in the tan Trailblazer.  Hall was watched to Edwin, where he arrived without the female.  A black male exited the front door of Edwin and got into the Trailblazer.  After a short time, the black male exited the Trailblazer and went back inside Edwin.  Hall then left Edwin in the Trailblazer and made several brief stops around Kalamazoo.  Hall drove the Trailblazer to Benton Harbor on April 4, 2015.

On April 6, 2015, after Howell contacted the CI about Hall being out of town, KVET had the CI arrange a controlled buy from "Mike" (Jenkins).  The CI used the (702) number to call "Mike" and was instructed where to meet.  Prior to the buy, investigators conducted surveillance on Edwin and observed the blue Malibu (previously described as black in connection with the February 19, 2015 controlled buy) parked in the driveway.  Subsequently, investigators observed the Malibu arrive at the pre-arranged location to meet the CI.  About twenty minutes after the sale occurred, the blue Malibu was observed back in the driveway of Edwin.

### 3.    April 8, 2015 Search Warrants

On April 8, 2015, investigators executed search warrants on Dragonfly, Candlewyck, and Edwin.  KVET Officer Reiser prepared and submitted the supporting affidavits, which detailed, among other things: (1) the 2014 heroin conspiracy investigation involving Howell; (2) the six

controlled purchases involving Ghost Phone 2 and the (702) phone number; (3) evidence from the December 2014 search warrants; and (4) the surveillance conducted by investigators. During the search of Dragonfly, investigators found 1.92 grams of heroin, three cell phones, and $1,200 in cash. During the search of Candlewyck, investigators found 13.89 grams of cocaine base, a scale with heroin residue, and over $9,000 in cash. At Edwin, investigators discovered 5.19 grams of cocaine, a digital scale, a glass bowl with suspected cocaine residue, and numerous cell phones.

## II. DISCUSSION

### A. Probable Cause Standard

"Probable cause is defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). To establish probable cause, an affidavit in support of "a search warrant need not establish beyond a reasonable doubt that incriminating evidence will be found on the premises to be searched." *United States v. Blakeney*, 942 F.2d 1001, 1025 (6th Cir. 1991). The affidavit need not be "perfect" or "provide every specific piece of information to be upheld." *Hale v. Kart*, 396 F.3d 721, 725 (6th Cir. 2005). However, there must be a "substantial basis" for concluding that evidence of a crime will be found at the location to be searched. *See id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983)).

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis" for concluding that probable cause existed.

*Gates*, 462 U.S. at 238, 103 S. Ct. at 2332. In other words, "[p]robable cause for the issuance of a search warrant is defined in terms of whether the affidavit sets out facts and circumstances which indicate a fair probability that evidence of a crime will be located on the premises of the proposed

search." *United States v. Finch*, 998 F.2d 349, 352 (6th Cir. 1993). Whether probable cause exists thus "depends on the totality of the circumstances." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (citing *Gates*, 462 U.S. at 230, 103 S. Ct. at 2328).

An affidavit must demonstrate the existence of a nexus, *i.e.*, it must provide enough facts to establish a fair probability that incriminating evidence will be found in the particular place. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). Thus, "the affidavit must suggest 'that there is reasonable cause to believe that the specific "things" to be searched for and seized are located on the property to which entry is sought' and not merely 'that the owner of property is suspected of a crime.'" *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556, 98 S. Ct. 1970, 1976–77 (1978)).

Although search warrant affidavits are presumed to be valid, a defendant may challenge a warrant's validity if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S. Ct. 2674, 2676 (1978). The search warrant must be voided and the results of the search excluded only where the defendant establishes his allegations by a preponderance of the evidence and the remaining content is insufficient to establish probable cause. *Id.* at 156, 98 S. Ct. at 2676. While an omission in an affidavit may support a *Franks* hearing, the Sixth Circuit has recognized that an omission "is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997) (citing *United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990)). "This is so because an allegation of omission potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id.*

## B.   Good Faith Exception

Even when probable cause is absent, suppression of evidence obtained pursuant to a warrant is not automatically required.  *See United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004). In *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405 (1984), the Supreme Court held that "suppression of evidence obtained pursuant to a warrant [lacking probable cause] should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule."  *Id.* at 918, 104 S. Ct. at 3418.  The Court observed that because the exclusionary rule is designed to deter police misconduct, application of the rule does not further its purpose "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope."  *Id.* at 920, 104 S. Ct. at 3419.  Pursuant to *Leon*, "only police conduct that evidences a 'deliberate, reckless, or grossly negligent' disregard for Fourth Amendment rights" will warrant application of the exclusionary rule.  *United States v. Kinison*, 710 F.3d 678, 685 (6th Cir. 2013) (quoting *Davis v. United States*, 564 U.S. 229, 238, 131 S. Ct. 2419, 2427 (2011)).  An affiant's lack of good faith can be shown in four instances:

> (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false . . .; (2) where the issuing magistrate wholly abandoned his judicial role . . .' (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively unreasonable, such as where the warrant is facially deficient.

*United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006) (citing *Leon*, 468 U.S. at 923, 104 S. Ct. at 3421).

## C.   The Searches

### 1.   Dori Drive (Howell) and Lakesedge (Streeter)

Howell moves to suppress evidence obtained from the search of Dori Drive and Streeter moves to suppress evidence obtained from the search of Lakesedge.  In addition, Howell and

Streeter both request a *Franks* hearing.  Because the affidavits for Dori Drive and Lakesedge contained essentially the same information, and because Howell and Streeter assert the same grounds for a *Franks* hearing, the Court will address those searches together.

As previously noted, Officer Reiser's affidavit set forth facts describing: (1)  the Ghost Phone and its connection to heroin trafficking, including two of its users, "Ghost" and "Dreds"; (2) details of the five controlled purchases, including the procedures used, descriptions of the vehicles, and, in some instances registration information connecting the vehicles to Howell and Streeter; (3) cellular location ping data for the Ghost Phone, connecting it to Dori Drive and Lakesedge; (4) details of surveillance conducted on Dori Drive and Lakesedge close in time to the warrant applications; and (5) Officer Reiser's statements that, based on his training and experience, Howell, Streeter, and the other unidentified black male were working in a coordinated effort to sell and distribute heroin; that drug traffickers commonly use family members, girlfriends, and others to assist in drug trafficking by obtaining residences, vehicles, and other items in their own names; and that drug traffickers often maintain drugs and instrumentalities of drug trafficking at their residences.  Although Howell focuses his arguments primarily on his motion for a *Franks* hearing, Streeter raises several arguments pertaining to the sufficiency of the affidavit.

### a.    CI's Credibility

Streeter first argues that the affidavit lacked any information establishing the CI's credibility. Streeter notes that until October 2014, the informant was unknown to KVET and lacked a prior track record substantiating that his statements were reliable.  Streeter notes that because most of the information came from the CI and the affidavit lacked allegations providing a basis for crediting the CI's statements, the CI's statements cannot be considered as part of the probable cause determination.  Streeter contends that, without the CI's statements, the affidavit fails to establish probable cause.

Streeter's argument fails because the affidavit sufficiently establishes the informant's credibility through substantial police corroboration. "[A]n affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information." *United States v. Woosley*, 361 F.3d 924, 927 (6th Cir. 2004) (citing *Gates*, 462 U.S. at 241–45, 103 S. Ct. at 2334–35). For example, "[k]nowledge of illegal drug activities, obtained by law enforcement officials through a confidential informant and independent surveillance, supports a district court's finding of probable cause to support the issuance of a warrant." *United States v. Jones*, 159 F.3d 969, 974 (6th Cir. 1998). In addition, an informant's credibility is bolstered when police officers observe behavior consistent with an informant's prediction of criminal activity. *United States v. Howard*, 632 F. App'x 795, 804 (6th Cir. 2015).

In the instant case, the CI told investigators that he could arrange purchases of heroin by calling the Ghost Phone. The CI also stated that an individual known as "Ghost," and at other times, an individual known as "Dreds," would answer the phone, and that both individuals would often travel together. Over the course of about two months, the CI set up five controlled buys—all resulting in purchases of heroin—while under constant surveillance by KVET investigators. Streeter and Howell were identified by KVET investigators and the CI as direct participants in three of the purchases. In addition, the CI identified Howell as "Ghost" and Streeter as "Dreds" based on Howell's and Streeter's prior arrest photos.

Other evidence corroborated the CI's assertions that Howell and Streeter were involved in a heroin distribution conspiracy. For example, the cell phone ping location data confirmed that the Ghost Phone was often used at Dori Drive—Howell's known address—and Lakesedge—an apartment that investigators associated with Streeter through surveillance of the maroon Jeep Cherokee, registered to Demaurious Lamar Streeter and parked in the Lakesedge parking lot, as well

as Streeter's entry of the premises.  Finally, the affidavit stated that within seven days of the warrant application, Ghost Phone location data indicated that it was in the area of Lakesedge, and at or around that time Howell, Streeter and the unknown suspect (later identified as Lewis) were observed in the blue Buick conducting a suspected drug deal in an apartment complex, and that after the transaction, the Buick returned to Lakesedge and dropped Streeter and a small child off and they entered Apartment C.  Based on all of this information, the CI's statements were sufficiently corroborated.

### b.  Staleness

Streeter next argues that the affidavit used stale information to establish probable cause.  He notes that the affidavit only alleges that Streeter engaged in three transactions that occurred over three weeks in October and November at various locations throughout Kalamazoo, but the last time Streeter is identified as a seller (although the CI identified Streeter as an occupant of the vehicle in the two other transactions) was October 23, 2014—almost eight weeks before Lakesedge was searched.  Streeter argues that the affidavit does not offer fresh information indicating that Streeter was continuing to sell drugs closer in time to the affidavit.

Whether evidence is stale must be determined based on the circumstances of each case. *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998).  Courts consider "four practical, fact-dependent considerations" in determining whether evidence is stale.  *United States v. Burney*, 778 F.3d 536, 540 (6th Cir. 2015).  Those considerations are:

> (1) the character of the crime (chance encounter in the night or regenerating conspiracy?), (2) the criminal (nomadic or entrenched?), (3) the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?), and (4) the place to be searched (mere criminal forum or secure operational base?).

*Id.* at 540–41 (quoting *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009)).  Application of these factors in this case shows that the evidence was not stale.  First, the investigation concerned an ongoing heroin conspiracy involving at least three individuals, as evidenced by the October and

15

November controlled purchases involving Streeter and the December controlled purchases from Lewis, in which Streeter was not a participant.  Such "[e]vidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001).  Moreover, Streeter's argument that the affidavit lacked fresh evidence of his participation ignores the affidavit's statement that within seven days prior to the affidavit the Ghost Phone was pinging in the Lakesedge complex and, shortly thereafter, Officer Reiser observed Howell, Streeter, and Lewis participate in a suspected drug transaction, after which Streeter and a small child returned to 4309 Lakesedge, Apartment C.  Although Streeter dismisses the "suspected narcotics deal" statement as speculation, Officer Reiser had a well-founded basis to conclude that the three conspirators were selling drugs—all of the observed heroin transactions were conducted in the same manner, from cars in apartment and hotel parking lots.  Second, there is no indication that Streeter was nomadic.  In fact, the affidavit states that Lakesedge was one of the locations Ghost Phone users frequented during the almost two-month investigation.  Third, while it is true that heroin and other controlled substances are perishable, the warrant also covered tools, equipment, records, notes, currency and firearms, which are "unlikely to be consumed or to disappear, precisely because [such] evidence . . . is not readily consumable and is of enduring utility to its holder."  *Burney*, 778 F.3d at 541 (internal quotation marks omitted).  Finally, the Lakesedge apartment was "a secure operational base" rather than a mere criminal forum.

        **c.**     **Probable Cause**

### *Dori Drive*

There is little question that the affidavit for Dori Drive shows that Howell was engaged in criminal activity.  The pertinent question, however, is whether the affidavit established the required nexus between Howell's drug trafficking and Dori Drive.  As support for a nexus, the Government relies principally upon a number of Sixth Circuit cases holding that, in the case of a known drug

dealer, a magistrate may infer that evidence of drug trafficking is likely to be found in the drug dealer's house.  In particular, the Sixth Circuit has recognized the "logical, and indeed legally correct . . . [view] that it is reasonable to suppose that some criminals store evidence of their crimes in their homes, even though no criminal activity or contraband is observed there." *United States v. Williams*, 544 F.3d 683, 686–87 (6th Cir. 2008) (internal quotation marks omitted).  This rule has often been applied  in cases of ongoing drug trafficking, where the Sixth Circuit has "held that an issuing judge may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking." *Id.* at 687 (citing, among others, *United States v. Miggins*, 302 F.3d 384, 393–94 (6th Cir. 2002) (holding that probable cause existed because the affidavit established that the defendants were involved in drug dealing and sufficiently connected the defendants to the place to be searched)); *see also United States v. Goward*, 188 F. App'x 355, 359–60 (6th Cir. 2006) (stating that "drug trafficking, which the affiant witnessed and is further substantiated from his experience and training, establishes a sufficient nexus to support a finding of probable cause to search the place where the drug trafficker presently lives"); *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998) ("The recited statements supporting the search warrant and the fact that in the case of drug dealers, evidence is likely to be found where the dealers live, support a finding of probable cause to support the issuance of the warrant." (internal quotation marks, brackets, and citation omitted)).  Other cases suggest that something more than drug dealer status is required to infer a nexus.  For example, in *United States v. Frazier*, 423 F.3d 526 (6th Cir. 2005), the court said that *Miggins*, *Jones*, and other Sixth Circuit cases do not support "the proposition that the defendant's status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home." *Id.* at 533.  The court explained, however, that

> [w]here, as here, the warrant affidavit is based almost exclusively on the uncorroborated testimony of unproven confidential informants (none of whom witnessed illegal activity on the premises of the proposed search), the allegation that the defendant is a drug dealer, without more, is insufficient to tie the alleged criminal activity to the defendant's residence.

*Id.* The court did not indicate whether the "more" could simply be corroborated confidential informant statements or whether some direct evidence physically tying drug dealing to the premises to be searched is required. More recently, in *United States v. Brown*, __ F.3d __, 2016 WL 3584723 (6th Cir. July 31, 2016), the Sixth Circuit stated that

> our cases teach, as a general matter, that if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendants' motion—even if the defendant is a known drug dealer.

*Id.* at *6; *but see Williams*, 544 F.3d at 688 (stating that "we join other circuits which have held, in cases involving a variety of suspected crimes, that an issuing judge may infer that a criminal suspect keeps the instrumentalities and fruits of his crime in his residence" (internal quotation marks omitted)).

The affidavit established that Howell resided at Dori Drive, based upon Howell's own report in connection with his prior arrest and subsequent police surveillance. In addition, the affidavit presented the CI's statements, independently corroborated, that Howell was a known drug dealer. To the extent something more is required under Sixth Circuit precedent, the location data for the Ghost Phone—an instrumentality of the crime—indicated that it was regularly used at Dori Drive, thus allowing the issuing judge to directly connect Howell's drug dealing to his residence. The fact that Howell used a vehicle registered to his girlfriend at Dori Drive in one of the controlled purchases and was present nearby in the same vehicle for another controlled purchase provided additional support for a nexus. *Cf. Washington*, 380 F.3d at 243 (observing that the fact that the defendant drove to two drug deals in a vehicle registered to a person at the searched premises, along with other facts, "very well" might have been enough to support probable cause). Finally, the observed suspected drug deal within seven days of the date of the affidavit, in which Howell was a participant, indicated an ongoing narcotics conspiracy, from which the issuing judge could infer

the likelihood that evidence pertaining to drug dealing would be found at Dori Drive. *See Williams*, 544 F.3d at 687 (stating that "the warrant application demonstrated 'continuing and related illegal firearm activity' from which the issuing judge could further infer that evidence pertaining to the handguns would be found in Williams's residence").    Accordingly, based on the totality of the circumstances, the Court concludes that the warrant for Dori Drive was supported by probable cause.

### *Lakesedge*

Whether there was probable cause to search Lakesedge is, in the Court's judgment, a closer question because Streeter's connection to Lakesedge, as laid out in the affidavit, is more tenuous than Howell's connection to Dori Drive. In contrast to Howell, the affidavit did not list Lakesedge as the address on file for Streeter in connection with his prior arrest, nor did it state that investigators had identified the lessee. In this circumstance the Court may assume a lack of probable cause and proceed to the good faith exception.[7] *See Washington*, 380 F.3d at 240 (assuming a lack of probable cause because the good faith exception clearly applied).

As already noted, when officers rely in good faith on a search warrant that is subsequently found to be defective, the exclusionary rule will not bar admission of evidence seized pursuant to the warrant unless one of four exceptions applies. *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005). Streeter argues that the good faith exception does not apply because no reasonably well-trained police officer could have believed that the affidavit sufficed to establish probable cause. In particular, Streeter argues that reliance on the affidavit was unreasonable because the affidavit did not establish the CI's credibility. However, as the Court has already found, the affidavit

---

[7]In his reply, Streeter argues, correctly, that the Court may not consider in a probable cause determination the information about the December 14, 2014 incident in which police officers found heroin that Howell had discarded in a bathroom at a gas station. Because such information was not included in the affidavit and apparently not otherwise presented to the issuing judge, the court may not consider it in determining whether an objectively reasonable police officer would have relied on the warrant. *See United States v. Laughton*, 409 F.3d 744, 752 (6th Cir. 2005) (holding that "the good faith exception to the exclusionary rule does not permit consideration of information known to a police officer, but not included in the affidavit, in determining whether an objectively reasonable officer would have relied on the warrant").

demonstrated the informant's reliability through independent police corroboration.  Specifically, with regard to Streeter, the CI identified Streeter as a participant in three of the controlled purchases and KVET investigators confirmed Streeter's role as a participant through surveillance and through the CI's identification of Streeter's arrest photograph as the person the CI knew as "Dreds." Registration information for the maroon Jeep Cherokee, an observation of Streeter entering the Lakesedge apartment, the Ghost Phone location data, and the observation of Streeter participating in a suspected drug deal with Howell and Lewis further corroborated the CI's statements, even if, as Streeter argues, investigators were only able to visually confirm Streeter's involvement in one of the controlled purchases.

As was the case with the Dori Drive affidavit, nexus is the central issue with regard to the Lakesedge affidavit.  The Sixth Circuit has stated that, for purposes of the good faith exception, "[t]he conclusion that the officers' reliance on the warrant was objectively reasonable requires a less demanding showing than the substantial basis threshold required to prove the existence of probable cause." *United States v. Soto*, 794 F.3d 635, 646 (6th Cir. 2015) (internal quotation marks omitted). "Thus, it is entirely possible that an affidavit could be insufficient for probable cause but sufficient for 'good-faith' reliance." *Washington*, 380 F. 3d at 241.  In the context of good faith, all that is required is facts establishing a "minimally sufficient nexus between the illegal activity and the place to be searched." *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004).

Several cases from the Sixth Circuit illustrate the parameters of the "minimal nexus" requirement for objective good faith.  In *Washington*, the court observed that the facts "might very well . . . [have been] enough to establish probable cause," but the court opted to consider them under the good faith exception.  *Washington*, 380 F.3d at 243.  The defendant in *Washington* drove a blue Cadillac, registered to a person at 3112 Crossgate Road, to two drug transactions in which the affiant was involved.  Prior to the second transaction, the defendant said that he would be delayed because

20

he had to pick up his car at a repair shop.  *Id.* at 238–39.  Shortly thereafter, officers observed the defendant leaving 3112 Crossgate Road and getting into a Chevrolet Blazer, which dropped the defendant off at a repair shop.  After the defendant picked up the Cadillac, he called a participant in the transaction and instructed the participant to go to a Burger King parking lot.  *Id.* at 239.  The Cadillac eventually arrived at the Burger King and the defendant engaged in the drug transaction.  Although the affiant was not able to identify the defendant at that time, the affiant subsequently observed the Cadillac in the driveway of 3112 Crossgate Road on two separate days.  *Id.*  In addition to these facts, the affidavit stated that an armed robbery had occurred at 3112 Crossgate Road two months prior, which was indicative of suspects searching for narcotics or cash.  *Id.*  The court concluded that these facts "clearly satisfied the 'so lacking' standard necessary for *Leon*'s good-faith exception to be applied."  *Id.* at 243.  In particular, the court noted that "[t]here was a visible nexus connecting Washington to the house, Washington to the Cadillac, and the Cadillac to the house." *Id.*

In *Carpenter*, the police discovered marijuana growing fields through aerial surveillance. The police also saw beaten paths from the back door of a nearby residence to the marijuana patches and two men walking from the fields toward the residence.  360 F.3d at 593.  The court said that this information fell short of the required showing of nexus for probable cause because the facts were "too vague, generalized, and insubstantial."  *Id* at 595.  However, the court observed that "the affidavit was not completely devoid of any nexus between the residence and the marijuana that the police observed . . . [because] it noted both that the marijuana was growing 'near' the residence and that 'there is a road connecting' the residence and the marijuana plants."  *Id.* at 595–96.  The court concluded that "these facts . . . were not so vague as to be conclusory or meaningless."  *Id.* at 596.

*United States v. Schultz*, 14 F.3d 1093 (6th Cir. 1994), likely represents the outer limits of what constitutes a minimally sufficient nexus, as one panel has described *Schultz* as "perhaps the

weakest link between criminal activity and the place to be searched." *Laughton*, 409 F.3d at 749. In *Schultz*, a police officer arrested a suspect for possession of drugs and the suspect told the officer the name of his supplier.  Through a series of subsequent arrests, the officer learned the name of the defendant, Schultz, as the local supplier with Jamaican connections. *Schultz*, 14 F.3d at 1096.  None of the individuals who supplied information to the officer had ever been used as police informants. Through investigation, the officer confirmed that phone records showed that calls were made from Jamaica to the phone number of a woman in whose car Shultz had once been issued a traffic citation, that Schultz had been parking his car at the apartment complex connected to the phone number, that Schultz had prior convictions for possession of marijuana and had been observed in Fort Myers, Florida, to where calls had been made from the phone number, and that Schultz maintained safe deposit boxes at a bank. *Id.* at 1091.  The court found probable cause lacking because the affidavit failed to demonstrate "any material connection between the bank and any criminal activity" other than the officer's statement that based on his training and experience he believed that it was not uncommon for drug dealers to maintain records of drug distribution in bank safe deposit boxes. *Id.* The  officer's "training and experience" was an insufficient basis to establish a nexus because the officer "did not have anything more than a guess that contraband or evidence of a crime would be found in the boxes." *Id.* at 1097–98.  Nonetheless, the court held that the good faith exception applied:

> [W]e cannot say that this warrant was "so lacking[]" [in probable cause]. . . .Officer Ideker certainly had probable cause to believe that Schultz had committed a crime. Moreover, although we have held that his "training and experience" were not sufficient to establish a nexus of probable cause between that crime and the safe deposit boxes, the connection was not so remote as to trip on the "so lacking" hurdle.

*Id.* at 1098.

Based on the foregoing cases, the Lakesedge affidavit was not "so lacking" in probable cause because it met the minimal nexus requirement.  Officer Reiser's affidavit confirms Streeter's

involvement in the heroin conspiracy, and connects the maroon Jeep Cherokee, used in the second controlled purchase, to Lakesedge. The Cherokee was observed on at least two occasions parked at Lakesedge (the last date being on the date the affidavit was prepared) and it was registered to someone named Streeter from Benton Harbor. Moreover, Streeter was observed entering the Lakesedge apartment after participating in a suspected drug deal with Howell and Lewis. Finally, the Ghost Phone location data showing its frequent use at or near Lakesedge buttressed the connection between Lakesedge and illegal activity.[8]

### d.   *Franks* Motions

Howell and Streeter have also filed motions for a *Franks* hearing on the Dori Drive and Lakesedge affidavits. First, they argue that Officer Reiser's own report with regard to the first controlled buy on October 23, 2014 contradicts the affidavits. Howell and Streeter note that, whereas the affidavits state that the informant said that Dreds was the driver and Ghost was the passenger, Officer Reiser's report states that the CI said that Dreds had an unknown passenger with him. (*Compare* ECF No. 143-2 at PageID.573 and ECF No. 199-1 at PageID.1178 *with* ECF No. 143-4 at PageID.593.) Second, with regard to the second controlled buy on October 30, 2014 in which Dreds is identified as the driver of the maroon Jeep Cherokee, Howell and Streeter note that Sergeant VanderEnde, who conducted surveillance, reported seeing Streeter Driving a BMW without mention of a passenger, but then contradicted himself and reported that Streeter got out of

---

[8]Streeter cites the Sixth Circuit's recent decision in *United States v. Brown*, __ F.3d __, 2016 WL 3584723 (6th Cir. June 27, 2016), to support his argument that the affidavit did not establish probable cause and that the good faith exception does not apply. However, *Brown* is distinguishable on its facts. In *Brown*, the court noted in its probable cause analysis that the affidavit did not state that the defendant had distributed drugs from his home, that any suspicious activity had taken place there, that police had conducted surveillance on the defendant's home, or that the recorded telephone conversations linked drug trafficking to the defendant's home. *Id.* at *5. In the instant case, officers surveilled Streeter's apartment, noted that a vehicle registered to a person named Streeter used in one of the prior transactions was parked there, had the Ghost Phone location data linking Streeter's apartment to the heroin distribution, and saw Streeter entering Lakesedge following a suspected drug transaction. Moreover, the court in *Brown* concluded that the good faith exception did not apply because the police waited 22 days after they arrested the defendant to seek a warrant to search the defendant's residence, even though they had not obtained any additional evidence of significance prior to seeking the warrant. *Id.* at *7.

a red Jeep, made contact with driver of the driver of the BMW, and then drove off in the Jeep, followed by the BMW. (ECF No. 143-5 at PageID.605–06.) Finally, Howell and Streeter note that with regard to the third purchase on November 17, 2014, the affidavits state that Streeter was driving the black Chrysler 300, but Officer Reiser's report states that Howell was the driver and sold heroin to the CI and that Streeter was the passenger. (*Compare* ECF No. 143-2 at PageID.574 and ECF No. 199-1 at PageID.1179 *with* ECF No. 143-5 at PageID.610.)

Howell and Streeter fail to make a substantial showing that false information was knowingly or recklessly included in the affidavit, as required for a *Franks* hearing. As to the first controlled buy on October 23, 2014, the police report states that the CI could not identify the passenger in the car. However, the affidavit makes clear that it was the officers who identified Howell as the passenger. Although the CI knew of "Ghost" as the supplier from the Ghost Phone, it appears that the CI did not know Howell as "Ghost" at the time of the first controlled purchase. Nonetheless, the affidavit confirms that at some point the CI confirmed from Howell's prior arrest photograph that Howell was the person he had seen with Streeter. The second basis also fails to show the inclusion of a false statement in the affidavits. The apparent contradiction in Sergeant VanderEnde's report does not exist. Streeter was first observed driving the BMW from Lakesedge to Dori Drive and later, apparently before the controlled purchase occurred, switched to driving the maroon Jeep Cherokee the conspirators used in the second controlled purchase. In fact, Sergeant VanderEnde's report makes clear that Streeter drove the Jeep to a gas station, made contact with the driver of the BMW, got back into the Jeep, and both vehicles drove away. The report indicates that the purchase occurred after the activity at the gas station. Finally, as to the difference between the affidavits and Officer Reiser's report of the November 17 sale, it appears that the affidavit mistakenly switched the driver and passenger. Reiser's report is probably correct—that Howell was the driver of the Chrysler 300 and sold the drugs and Streeter was the passenger—because the Chrysler 300 was

registered to Howell's girlfriend at the Dori Drive address.  Either way, Howell and Streeter were both confirmed  present during the sale.

### 2.    Dragonfly (Howell and Jenkins)

Regarding Dragonfly, Officer Reiser's affidavit set forth: (1) facts concerning the 2014 investigation which revealed that Howell was a conspirator in the heroin conspiracy involving individuals who (a) had moved from Benton Harbor to Kalamazoo to further heroin trafficking (b) used residences primarily rented out by females and (c) frequently switched vehicles and took turns delivering the drugs; (2) facts concerning the 2014 searches and the results of those searches; (3) information pertaining to the Ghost Phone 2 and the (702) number (although no cell phone location data was obtained); (3) that Lashonda Reynolds, Howell's girlfriend and the mother of his child, was listed as the lessee for Dragonfly; (4) that a gold Chevy Malibu Reynolds was leasing had been parked outside of Dragonfly on several days, including overnight, and that Howell had driven the Malibu; (5) that Howell had called the CI and told the CI that Hall would be out of town and that the CI should call Howell to purchase heroin; and (6) that the CI made a controlled purchase from Howell within 24 hours of the affidavit and that, prior to the sale, Howell was observed exiting Dragonfly and driving away in the Malibu to the sale location, then returning to Dragonfly, exiting the Malibu, and entering the apartment.

These facts provide a substantial basis for probable cause, including support for a nexus between Howell's drug dealing and Dragonfly.  The affidavit showed that Howell was still engaged in drug dealing and was still living with Reynolds—the lessee of Dragonfly.  Based on the presumption discussed above and the recited facts concerning the controlled purchase, Officer Reiser had a strong basis to conclude that evidence of drug trafficking would be found inside Dragonfly.

Splitting hairs, Jenkins argues that the affidavit's statement that Howell arrived at the site of the controlled purchase "soon after" he exited Dragonfly and drove away in the Malibu is too vague and imprecise to support an inference that Howell drove directly from Dragonfly to the sale because the word "soon" has no precise temporal meaning.[9]  Jenkins's argument lacks merit. "Soon" means "within a short period after this or that time, event, etc." *Random House Dictionary of the English Language* 1820 (2d ed. 1987).  Context is everything.  A student beginning his senior year of high school will soon graduate from high school.  A trip to Europe planned a year ago but now only a month off will happen soon.  Howell was leaving his apartment to sell drugs and arrived at the parking lot "soon after" he left Dragonfly, *i.e.*, a short time later.[10]

### 3.    Candlewyck and Edwin (Jenkins)

The searches of Candlewyck and Edwin are considered together because the facts in both affidavits substantially overlap.

As with Lakesedge, the Court will assume that probable cause is lacking and proceed to the good faith exception in discussing Candlewyck and Edwin because neither affidavit firmly shows that a conspirator resided at the premises, for purposes of applying the presumption discussed above. While the Candlewyck affidavit shows that Hall was often present at Candlewyck, he was not the lessee, his relationship to the lessee is unknown, and there is some question as to whether it was his residence.  The Edwin affidavit did not contain any owner/lessee information for the premises, and there is no indication that any defendant resided there.

---

[9]The Court understands that standing to challenge a search is an issue of Fourth Amendment jurisprudence rather than Article III jurisdiction and, therefore, by failing to raise Jenkins's standing to challenge the search of Dragonfly, the Government has waived the issue.  *See United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009).  In any event, it is interesting to note that Jenkins is challenging the search of an apartment to which he apparently has no connection, notwithstanding his counsel's statements at oral argument that Jenkins really had nothing to do with Howell.

[10]Although the Court does not specifically address the application of the good faith exception to Dragonfly, the facts set forth in the affidavit are more than sufficient to meet the "so lacking" standard and certainly establish the requisite "minimally sufficient nexus."

With regard to Candlewyck, Hall was the primary identified suspect connected to that location.  KVET investigators confirmed that Hall was the suspect in at least one, and likely two, controlled purchases in which the baby blue Toyota Yaris was used.  On each occasion, Hall and/or another driver drove to Candlewyck after the sale and entered the 300 building.  Hall was also observed leaving Candlewyck in the Yaris and driving to several business and apartment complex parking lots, where he made brief contacts with subjects in other vehicles in a manner consistent with drug sales.  The Yaris, driven by an unknown driver, was also observed traveling from Candlewyck to Edwin, where a black male passenger got out of the Yaris and carried a black duffle bag inside Edwin.  A few weeks later, Hall was seen leaving Candlewyck, entering the tan Trailblazer, driving to two apartment complexes, and engaging in what appeared to be drug sales. The true nature of these transactions was confirmed when KVET investigators arranged a controlled purchase while Hall was still parked in the parking lot of the second apartment complex.

In the Court's judgment, the facts set forth in the Candlewyck affidavit provide a much stronger basis for a "minimally sufficient nexus" than was the case in *Schultz*.  In the instant case, the affidavit set forth a direct connection between Hall's drug dealing and Candlewyck—Hall's leaving Candlewyck to engage in drug sales or returning to Candlewyck from drug sales.  Jenkins argues that the good faith exception does not apply in this case because Officer Reiser's affidavit was a "bare bones" affidavit.  The Court disagrees.  A "bare bones" affidavit is one that merely "states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge."  *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 2006).  As set forth above, the Candlewyck affidavit contains substantial facts, not merely suspicions or beliefs. Jenkins also argues that the affidavit failed to provide a sufficient basis to search Apartment 1203 of 300 Candlewyck, as opposed to some other unit within that building. However, the affidavit provided ample basis to conclude that Hall was connected with Apartment

27

1203.  The affidavit states that the driver of the baby blue Yaris was observed keying into Apartment 1203.  Jenkins makes much of the fact that investigator Ham only observed "the driver of the baby blue Toyota Yaris key into 300 Candlewyck drive, apartment 1203," and not Hall.  However, it is reasonable to infer that any person driving the Yaris would  key into the same apartment, and since Hall drove the Toyota he likely keyed into Apartment 1203.  The conclusion that Hall was connected to Apartment 1203 was bolstered by the information regarding Yaquina Walker.  She was the lessee of Apartment 1203, and the Chevy Uplander that was registered in her name and parked in front of 300 Candlewyck was observed at the site of a controlled buy in 2014 involving Howell and left the parking lot shortly after Howell's vehicle left.  Such facts connected Apartment 1203 to the conspiracy and Hall to Apartment 1203.  Finally, Jenkins argues that, given Howell's statement to the CI around June 6, 2015 that Hall would be out of town, there was no longer any reason to believe that Candlewyck would have contained evidence of drug dealing.  Again, the Court disagrees.  The affidavit shows that Hall had left town only recently, and nothing stated in the affidavit suggests that Hall had moved out or had stopped using Candlewyck.

As for Edwin, the affidavit establishes the following: (1) on February 29, 2015, the suspect who sold heroin to the CI from the gold Malibu left the sale and drove to a gas station and switched to a black Chevy Malibu, license plate 7LFN85, registered to Karmease Langston at 520 Edwin; (2) on March 3, 2015, the Toyota Yaris traveled from Candlewyck to Edwin, where a black male passenger exited the Yaris with a black duffle bag and entered Edwin; (3) on April 1, 2015, Hall and Howell—known drug dealers—met the driver of the black Yukon (Jenkins) at Edwin, and were hanging around and getting into and out of the Yukon and Howell's gold Malibu; and (4) just prior to the June 6, 2015 controlled purchase involving "Mike" (Jenkins), the Malibu registered to Karmease Langston of 520 Edwin was parked in the driveway of Edwin, was then driven to the site of the controlled purchase, and returned to Edwin approximately 20 minutes later.  These facts

suffice to meet the "so lacking" standard and to establish a "minimally sufficient" nexus between Jenkins's and the other conspirators' drug activities and Edwin.  Similar to *Washington*, "[t]here was a visible nexus connecting [Jenkins] to the house, [Jenkins] to the [Malibu], and the [Malibu] to the house."  380 F.3d at 243.  That is, Jenkins drove the Malibu from Edwin to the June 6 drug sale, the Malibu was registered to a woman at Edwin, and Jenkins returned to Edwin after the sale.  Although the affidavit does not state that Jenkins exited Edwin right before leaving for the sale or went inside afterward, it is reasonable to infer that Jenkins was inside Edwin before he left for the sale.  Regardless, in *Carpenter*, there also was no indication in the affidavit that someone had walked on the paths from the marijuana to the residence, or vice versa, and yet the court concluded that the good faith exception applied.  The Court finds no reason to conclude otherwise with regard to the affidavit for Edwin.

## III. CONCLUSION

For the foregoing reasons, the Court will deny Defendants' motions to suppress evidence obtained from the searches of Dori Drive, Lakesedge, Dragonfly, Candlewyck, and Edwin.  The Court will also deny Defendants' Howell's and Streeter's motions for a *Franks* hearing.

A separate order will enter.

Dated:  August 23, 2016              _____/s/ Gordon J. Quist_____
                                                          GORDON J. QUIST
                                                     UNITED STATES DISTRICT JUDGE